BELL, administrator, *v.* ELROD.

The allegations of the petition in this case are not sufficient to authorize a court of equity to enforce, by decree of specific performance, the alleged contract of the father of an infant illegitimate child to adopt it and to make it his heir at law. Accordingly the court erred in overruling the general demurrer to the petition.

No. 1859. DECEMBER 15, 1920.

Action for specific performance. Before Judge Highsmith. Evans superior court. November 17, 1919.

On September 30, 1918, Nettie Wallace (formerly Nettie Elrod), as next friend of her infant child, John Willie Elrod, brought an equitable action against D. O. Bell as administrator of the estate of John W. Bell, deceased. The material allegations of the petition are to the following effect: On October 6, 1915, Nettie Wallace, then unmarried, gave birth to an illegitimate son whose father was John W. Bell, who paid all expenses of her lying in, and thereafter at all times until his death, April 28, 1918, recognized himself to be the father of the child, and many times expressed his intention to legally adopt it as his own. "On or about Dec. 1st, 1915, and on divers dates since then, John W. Bell undertook, promised, and agreed with Nettie Wallace, the mother of your petitioner, to formally and legally adopt your petitioner as his child, so that your petitioner could and would inherit his estate. . . This promise and agreement was made in consideration of the fact that said John W. Bell was the father

of your petitioner, and in consideration of the fact that his mother
would relinquish to him the control of your petitioner as soon
as your petitioner became of sufficient age not to need her care
and attention, which she did. On said date John W. Bell adopted
your petitioner as his child, and then and there agreed to apply
to the court for his legal adoption, which agreement he undertook
to carry out, and did all in his power to fulfill his solemn promise
and agreement to adopt your petitioner." " That in furtherance
of his said intentions and in recognition of and in compliance
with his promise to adopt said child, on or about the 28th day of
January, 1918, when said child was nearly two and one half
years of age," John W. Bell employed a named attorney to pre-
pare the necessary papers for the legal adoption of the child;
and about the same time he sent to petitioner, who was then liv-
ing in another county, sufficient money to pay her expenses to
the office of such attorney, to give her consent in writing to the
adoption of said child. " That your petitioner, in response to
his request, went to Glennville [where the attorney resided],
and there saw the petition that had been prepared for the adop-
tion of said child, and gave in writing her consent to the act of
adoption, and then and there delivered said child to the said J.
W. Bell, in compliance with his wishes and in carrying out the
adoption." The petition, with this petitioner's acknowledgment
of service thereon as well as her written consent thereto, was pre-
sented to the judge of the superior court. Before any action by
him was taken thereon, due to the absence from court of John W.
Bell on account of sickness, John W. Bell died leaving no widow
or child. The prayers of the petition are to the effect that the
defendant, as administrator of the estate of John W. Bell, " be
required to specifically perform said contract so made by said
John W. Bell with the mother of your petitioner, for and in his
behalf, for his adoption by said John W. Bell as his child and heir
at law;" that it be decreed that John Willie Elrod is entitled to
the entire estate of John W. Bell; that the defendant adminis-
trator be enjoined from disposing of any of the estate of his intes-
tate; that he account for so much of it as has been previously
sold; and for process. The judge overruled a general demurrer to
the petition, and exceptions pendente lite were duly filed. The
trial proceeded and resulted in a verdict for the petitioner. The

defendant made a motion for new trial, which was overruled, and he excepted. In the bill of exceptions error was assigned on the judgment overruling the motion for new trial, and on the exceptions pendente lite.

*A. S. Way* and *P. M. Anderson,* for plaintiff in error.

*Hines, Hardwick & Jordan* and *C. L. Cowart,* contra.

ATKINSON, J. The petition fails to allege a statutory adoption of the child under the Civil Code, § 3013, providing how a father may legitimate his illegitimate child, or under § 3016 providing how one person may adopt another as his child. In *Crawford* v. *Wilson,* 139 *Ga.* 654 (78 S. E. 30, 44 L. R. A. (N. S.) 773), there was no statutory adoption, but the child when an infant about three months old, being abandoned by its father, was delivered by its mother and grandmother to a third person under an agreement that such third person should have the sole custody and service and company of the child during her minority, the third person promising to take and keep the child as her own and adopt her as such with all the rights of a child related to her as such by blood. In pursuance of the agreement the third person took the child in her home, gave her name to it, and always treated it as her own, and the child never knew any other mother or home for more than twenty-five years, during which time she gave to the third person her love and constant attention as a child, assisting her in all household work, and rendering such personal service as only a dutiful child can render a mother. It was ruled: "A parol obligation by a person to adopt the child of another as his own, accompanied by a virtual though not a statutory adoption, and acted upon by all parties concerned for many years and during the obligor's life, may be enforced in equity upon the death of the obligor, by decreeing the child entitled as a child to the property of the obligor, undisposed of by will." In *Lansdell* v. *Lansdell,* 144 *Ga.* 571, 573 (87 S. E. 782), the decision in *Crawford* v. *Wilson* supra, was cited and applied, the court saying, however, that the decision in that case "should not be misunderstood," and further on the decision was construed as holding "that the facts alleged gave to the child such an equitable status and such equitable rights as she could enforce in a court having equitable jurisdiction." In *Shropshire* v. *Rainey,* ante 566 (104 S. E. 414), after discussing a number of decisions

by this court on the subject, it was said: "It will be seen that the *Crawford* case [supra] and others, relating to contracts adopting or promises to adopt a child, were founded largely on the changed relation or status of the child itself, and there had been a part performance of the agreement by the party adopting or promising to adopt the child; and the child's right to insist on the contract was derived, not from the contract alone, but from the conduct of the promisor in pursuance of the contract, and the wrong which the child would sustain if the contract were carried out in part and not in whole." The above excerpt, as well as the foregoing except from *Lansdell* v. *Lansdell,* supra, relates to the rights of the child to sue in its own name after attaining majority, but also bears upon the question of an equitable right to specific performance in behalf of the child under the circumstances stated. In all of the decisions of this court recognizing the right to specific performance of contracts of the character involved in this case, the child had so long occupied the position of a child to its foster parent, and so far performed the covenants imposed upon it by the terms of the contract under which it was delivered to the foster parent, as would change the status of the child and render it inequitable to deny specific performance of the contract. See *Pair* v. *Pair,* 147 *Ga.* 754 (95 S. E. 295), and citations therein and in the cases hereinbefore referred to. In *Rahn* v. *Hamilton,* 144 *Ga.* 644 (87 S. E. 1061), the children were kept by the foster parents two years; and it was held that the keeping of the children under the circumstances did not constitute an adoption. It was said: "There can be no legal adoption of a minor child (or adult person) in this State, except as provided in the Civil Code of 1910, §§ 3016 et seq. Accordingly, where the granduncle of the plaintiff and of her brother (plaintiff in another suit) asked their mother, 'Do you mean for me to have those children?' and the mother replied, 'Yes sir, I do,' and the uncle said, 'Don't you never fret nor worry about these little children; never no more. I will be a father for those children; they are my own children, my own flesh and blood;' and he said, 'As far as that goes, I will die by it. . . Daughter, remember this: I am more able to take care of those children than you are, and I mean to do it. . . When this old head is laid in the sod, there will be a god's plenty

left behind for them,' and 'Remember that, daughter, will you?' and she replied: 'Yes, uncle, I will;' and she testified that that was why she 'happened to surrender the children to him;' and where the children were taken by the uncle to his home, maintained, and sent to school until his death, which occurred over two years later,— this and other evidence of a similar import did not constitute a legal adoption of the child, so that they could inherit from the decedent's estate." In none of the cases cited above was the foster parent a natural parent of the child. In the case under consideration the child was the illegitimate son of the alleged foster parent. As the alleged contract was one for adoption of the child so that it might inherit, the fact that the foster father was the natural father of the illegitimate child would not require a different decision of the case. There is a general and broad allegation in the petition that the putative father adopted the child on or about December 1, 1915, when it was less than two months old. When this language is construed in connection with all the allegations in the petition, especially the allegations to the effect that when the child was about two and one half years of age, and about three months prior to the death of the putative father, the child was delivered by its mother to the father, such language must be construed as a mere conclusion of the pleader. The proper interpretation of the petition is that what the parties had in mind was a legal adoption of the child, and that such adoption never occurred. The allegations fail to show such performance of the contract or such change in the status of the child as would authorize a court of equity to decree specific performance of the contract. Under this view the trial court erred in refusing to dismiss the petition on general demurrer. All subsequent proceedings were nugatory.

*Judgment reversed. All the Justices concur.*